# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MARVIN SMITH,
     Plaintiff,                              Civil Action No. 1:05-cv-287

     vs.

HARTFORD LIFE & ACCIDENT          **REPORT AND**
INSURANCE COMPANY, et al.,         **RECOMMENDATION**
     Defendants.                  (Dlott, J.; Hogan, M.J.)

This case arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et. seq. ("ERISA"). Plaintiff asserts an ERISA claim for benefits under 29 U.S.C. § 1132 (a)(1)(B). Plaintiff contends that the termination of his long-term disability benefits due under the terms of his employer-sponsored plan by Hartford Life & Accident Insurance Company ("Hartford") violates ERISA. This matter is before the Court on the parties' cross-motions for judgment on the administrative record (Docs. 20, 23), and their respective opposing and supporting memoranda. (Docs. 25, 26, 27).

## PROCEDURAL BACKGROUND

Plaintiff was employed as a truck driver for FedEx Freight East, Inc. He was covered by a group insurance plan (the Plan) issued by Hartford. Hartford is both the insurer and administrator of the Plan.

Effective December 1, 2004, Hartford terminated plaintiff's long-term disability benefits. (See Administrative Record filed on 7/29/05, Doc. 11, at AR 5). Hartford determined that plaintiff's medical condition did not prevent him from performing one or more of the "Essential Duties of Any Occupation." (Doc. 11, the Plan at POL 20). On January 13, 2005, Hartford

denied plaintiff's appeal finding that plaintiff could work full-time in some sedentary occupation. (AR 88-91). Plaintiff then filed the instant lawsuit alleging a wrongful termination of benefits under the Plan. (Doc. 1).

## MEDICAL AND VOCATIONAL EVIDENCE

Plaintiff's job as a truck driver required him to stand and walk 25 to 40 percent of the time. (AR 508). Plaintiff was also required to lift up to 100 pounds. (AR 508). The job also involved climbing, squatting, stooping, and bending. (AR 508). Plaintiff stopped working on September 9, 2002 due to "severe chronic pain, severe physical limitations, acute anxiety reactions, and major depression." (AR 465). He applied to Hartford for long-term disability benefits in March 2003 (AR 464) alleging an inability to work due to lower back, right ankle, right knee, left arm/elbow and wrist, and right arm and shoulder impairments causing severe pain, stiffness, weakness and limitation of motion. (AR 466). He reported that he was unable to dress, bathe, eat or wipe himself after a bowel movement without his wife's assistance. (AR 468).

Plaintiff submitted a report from Dr. Aivars Vitols, plaintiff's treating orthopedic surgeon for more than ten years, in connection with his application for disability benefits. Dr. Vitols reported a primary diagnosis of  "Anterior Impingement Syndrome" with a secondary diagnosis of a ruptured rotator cuff. (AR 478). Dr. Vitols also noted psychiatric impairments of Major Depression Disorder, Anxiety Disorder, and Pain Disorder with Psychological Factors. (AR 480). Dr. Vitols submitted an additional page of information listing all of plaintiff's diagnoses, including: sprain/strain acromioclavicle; dislocation of shoulder; arthropathy, non-specific, shoulder; fracture olecrannon/ulna; post-op wound infection; medial epicondylites; ankylosis of

2

joint; lateral epicondylites right elbow; lumbar sprain/strain; torn medial meniscus; cervical sprain/strain; lumbago; and displacement of intervertebral disc without myelopathy. (AR 479).

Records submitted in connection with plaintiff's application for disability benefits show that on January 24, 1992, an MRI of plaintiff's lumbar spine revealed a "moderate sized left central disc protrusion … at L5-S1." (AR 496).  Plaintiff underwent a post-myelogram lumbar CT scan on February 19, 1992. (AR 497).  The impression of that test was a "left paracentral disc herniation at L5-S1 with effacement of the thecal sac and a left sided nerve root sleeve." (AR 497).  On March 5, 1992, plaintiff underwent a lumbar laminectomy of the L5-S1 disc with foraminotomy and decompression of the nerve root in order to address a herniated disc. (AR 487).  Dr. Vitols noted that plaintiff "has been followed since his work related injury with persistent back and left leg pain.  He has not responded to conservative treatment and has continued with severe pain.  All attempts at alleviating this have been futile." (AR 487).

On May 29, 2001, plaintiff underwent an arthroscopy of the right knee and partial medial meniscectomy for a torn medial meniscus. (AR 485).  Dr. Christopher DiPasquale performed the surgery and noted that plaintiff "sustained an injury to his right knee approximately two months ago while at work.  He states he twisted his knee and has had pain and intermittent swelling ever since." (AR 485).

An MRI of the left elbow performed August 3, 2001 showed a radial head fracture. (AR 491).  An MRI of the left wrist also performed that day showed "1. Carpal instability with dorsal intercalated segmental instability to a mild degree of the lunate. 2. Tear of triangle fibrocartilage complex. 3. Strain of the ulnar collateral ligament and dorsal radiocarpal ligament. 4. Subluxation of the distal radial ulnar joint. There are cystic changes in the lunate. No evidence of necroses." (AR 493-494).

Dr. Vitols performed a surgical arthroscopy of the left elbow on August 17, 2001. (AR 483). Dr. Vitols noted that plaintiff was "complaining of left elbow pain since sustaining a closed radial head fracture approximately 12 weeks ago." (AR 483). Prior to the arthroscopy, plaintiff "underwent physical therapy, but developed arthrofibrosis." (AR 483).

In September 2002, plaintiff sustained a work-related injury. An MRI of the right shoulder was performed on September 20, 2002 which revealed "1. Mild to moderate impingement. 2. Moderate supraspinatus tendonosis with some changes in the anterior infraspinatus fibers also. No evidence of full thickness tear.... 3. Prominent degenerative disease in the AC joint and degenerative cystic changes in the greater tuberosity are shown." (AR 489-490). Dr. Vitols performed arthroscopic surgery to repair plaintiff's torn rotator cuff on December 20, 2002. (AR 481).

On March 4, 2003, Dr. Vitols reported that plaintiff was "unable to stand for longer than 10 minutes due to severe low back pain & right ankle pain. Right knee pain climbing stairs permanently." (AR 480). Dr. Vitols also limited plaintiff's walking to 10 minute intervals and opined that "this is a permanent condition." *Id*. Dr. Vitols opined that plaintiff would have to change positions while seated every 15-20 minutes, was limited to carrying no more than 10 to 20 pounds due to chronic pain, and was limited to pushing or pulling no more than 10 pounds due to his back, shoulder, elbow and wrist conditions. *Id*. Dr. Vitols regarded these limitations as "permanent." (AR 480). Dr. Vitols opined that plaintiff was unable to safely drive and needed assistance with daily living tasks due to his medical conditions. (AR 480).

On May 30, 2003, Hartford notified plaintiff of its approval of plaintiff's claim for long-term disability benefits effective February 20, 2003. (AR 435; AR 425). Plaintiff was informed that his benefit payments would continue while he met the policy definition of Disability:

> Disability or Disabled means that during the Elimination Period and for the next
> 12 months you are prevented by:
>
> 1. accidental bodily injury;
> 2. sickness;
> 3. Mental Illness;
> 4. Substance Abuse; or
> 5. pregnancy
>
> from performing one or more of the Essential Duties of Your Occupation, and as
> a result your Current Monthly Earnings are no more than 80% of your Indexed
> Pre-Disability Earnings.
>
> As of 02/20/04, the definition of Disability or Disabled changes so that you must
> be prevented from performing one or more of the Essential Duties of Any
> Occupation.

(AR 435-436).

Thereafter, plaintiff was notified that Hartford had initiated an investigation to determine whether plaintiff was totally disabled from "any occupation." (AR 425).

Hartford received medical records from Dr. John Maguire of South Dayton Surgeons on December 4, 2003. (AR 404-10). Those records reveal that plaintiff underwent gastric bypass surgery on September 18, 2003, to address morbid obesity. (AR 405). The "[p]ostoperative course was unremarkable. The patient did well and improved to the point that he was able to be discharged on the 23rd and followed as an outpatient." (AR 405).

Dr. Vitols also enclosed medical records for review. (AR 400-03). An office note of March 27, 2003, indicates plaintiff was "status post-right shoulder partial cuff repair" and that he "has developed some adduction pain." (AR 402). Dr. Vitols also reported plaintiff "has excellent cuff strength." (AR 402). Dr. Vitols performed a Cortisone injection on April 17, 2003, and noted that the pain was "slowly decreasing" as of May 1, 2003. (AR 402). Dr. Vitols performed another injection on May 19, 2003, noting that plaintiff's "[s]houlder pain is

5

definitely decreased." (AR 402).  As of June 19, 2003, plaintiff rated his shoulder pain at 2/10

and told  Dr. Vitols that he was "satisfied with the end result.  This is something he can cope

with."  However, plaintiff still had stiffness and loss of full pronation and supination of his

elbow. (AR 401).

On January 22, 2003, Dr. Jennifer Stoeckel, Ph.D., evaluated plaintiff and diagnosed Pain

Disorder Associated with a Medical Condition and Psychological Factors, Major Depressive

Disorder, and Anxiety Disorder. (AR 221).  Her associates, psychologists Drs. Farrell and

Melchior,  submitted contemporaneous notes documenting plaintiff's office visits and mental

status. (AR 389-399).  As of March 31, 2003, plaintiff was "tearful in session. Feeling

overwhelmed with pain and limited activity. Extremely upset & embarrassed that he requires

assistance from spouse for personal hygiene. Talked also about feeling isolated." (AR 396).

Plaintiff's medication was changed to Remeron on April 25, 2003, and he reported "changes,

positive with its use." (AR 396).  Plaintiff's mood was "moderately improved from last session.

Not as tearful. Reported he's been putting more of an effort to socialize." (AR 396).  In May

2003, plaintiff was noted as "still struggling with his limitations and misses ability to work."

(AR 395).  He also reported continued stress related to his injuries, pain and limitations which

"contribute to cl[ient] feeling overwhelmed." (AR 395).  As of June 13, 2003, Dr. Farrell noted

that the "crying spells have decreased." (AR 393).  Plaintiff's "mood remain[ed] depressed &

anxious" on July 11, 2003. (AR 393).  On August 21, 2003, plaintiff's mood was anxious and

depressed and he talked about feeling overwhelmed with stress in his life.  It was also noted that

the depression from his injury was affecting his coping skills.  Dr. Farrell spoke with plaintiff

about starting intensive outpatient treatment on a weekly basis. (AR 391).  On August 29, 2003,

6

plaintiff's mood was "moderate. Affect somewhat flat." (AR 391).  Plaintiff returned to Dr. Farrell on November 13, 2003, after his stomach surgery, and his mood "remain[ed] depressed, anxious. Having difficulty relaxing." (AR 0392).  On November 21, 2003, plaintiff's mood was depressed and affect dysphoric.  He was struggling with his limited ability to get around.  He "misses being independent & being able to work." (AR 390).  On December 2, 2003, the psychologist noted "mood moderate. Affect mildly dysphoric. Was able to exhibit some bit of humor in session. Spoke of steps he is taking to cope [with] pain & depression. Reported he reads, he talks to family & friends on the phone, sometimes will do crossword puzzle – the paper. Cl[ient] needs to get out of house more. Directing Cl[ient] to do so to facilitate improved social contact." (AR 389).

On February 6, 2004, Hartford received a Notice of Award from the Social Security Administration ("SSA") granting plaintiff disability benefits under the Social Security Act. (AR 371-382).  The Social Security Administration determined that plaintiff was totally disabled based on his severe impairments of degenerative disc disease of the lumbosacral spine; post-laminectomy syndrome; impingement syndrome, right shoulder; history of ulnar fracture, right elbow; major depressive disorder and anxiety disorder.  The Administrative Law Judge determined that plaintiff's physical impairments limited his ability lift, carry, stand, walk, and sit, and that his mental impairments resulted in vocationally significant concentration deficits and limited him to unskilled. (AR 379).  The decision noted that plaintiff "is considered to be closely approaching advanced age. He has a high school education and has a semi-skilled work background, but does not possess transferable skills to work within his residual functional capacity." (AR 380).

On February 10, 2004, Dr. Farrell filled out a questionnaire for Hartford. (AR 370).  Dr. Farrell reported that plaintiff's motor activity was agitated, his thought content and process was worried, his sleep patterns disrupted, and his mood anxious and depressed. (AR 370).  Dr. Farrell noted "no panic attacks but frequent anxiety." (AR 370).  He also reported that plaintiff experienced decreased concentration and focus, decreased memory, and that plaintiff was moderately impaired in his ability to process simple information and follow simple instructions. *Id*.  Dr. Farrell stated that the frequency of crying was three times per month.  Plaintiff did not exhibit any agoraphobia, obsessiveness or psychotic signs or symptoms. *Id*.  His medications included Lexapro, Ambien, and Lorazepam. (AR 370).

Dr. Scott Zollett, plaintiff's primary care physician, faxed medical records to Hartford on February 24, 2004. (AR 359-364).  Plaintiff complained of increased back pain on December 6, 2003, and was put "back on Duragesic patch." (AR 361).  As of January 14, 2004, Dr. Zollett noted that plaintiff complains of "extreme fatigue, feels it is [secondary] to Remeron, no energy still has depression and mood swings. Seeing psychiatrist." (AR 361).  Dr. Zollett reported that plaintiff "appears tired, washed out." *Id*.  Dr. Zollett assessed depression, not tolerating Remeron, and fatigue secondary to weight loss. *Id*.  As of February 21, 2004, Dr. Zollett noted "some relief with Lexapro, still has bad days." (AR 360).  Plaintiff "appears pale and weak." *Id*.

Hartford retained University Disability Consortium, a group to which it regularly refers claims,[1] for medical and mental status record reviews.  Plaintiff's records were reviewed by  Dr. Pedro Garrido-Castillo, a psychologist, and Dr. Andrea Wagner, a physiatrist. (AR 321).

---

[1]Plaintiff presents evidence that Hartford paid UDC $2,781,328 in 2004. That same year, UDC evaluated 2185 claims for Hartford. (Doc. 20, Exh. A).

Both initially concluded that there was insufficient information to determine whether plaintiff was disabled. (AR 344, 345, 351, 352).  Dr. Garrido-Castillo's March 15, 2004 report concluded, "Based upon the available information which is more subjective than objective in nature, in my professional opinion, this claimant apparently continues to experience significant impairment in his psychological functioning, perhaps particularly in the social or interpersonal realm, that seems to be very directly related to his chronic pain and other medical conditions. Because of the limitations in the available information, restrictions and limitations and capacity for work cannot be adequately assessed.  It is not possible to assess the providers' methodologies." (AR 352).  That same date, Dr. Wagner also concluded that the "record does not include any comprehensive physical examination of Mr. Smith focusing on his various orthopedic issues.  In the absence of this, it is very difficult to obtain an accurate assessment of Mr. Smith's condition and functionality.  The medical record is very brief and not detailed.  The record merely discusses Mr. Smith's subjective pain complaints." (AR 344).

Hartford subsequently contacted an independent company, PsyBar, to arrange an independent psychological examination of plaintiff. (AR 310).  Dr. Peter Boxer, who is Board Certified in Psychiatry and in Occupational Medicine, subsequently submitted a report of his Independent Psychiatric Examination. (AR 230-238).  On May 13, 2004, Dr. Boxer "interviewed Mr. Smith for 2 hours and he also completed a standard psychological test, the MMPI-2." (AR 230).  Dr. Boxer also reviewed the medical records. *Id.*  Plaintiff advised Dr. Boxer that since taking Lexapro his "crying spells have been reduced from about 3 to 4 per week to 'mostly when I see doctors or when I feel sorry for myself,' a couple of times per month." (AR 231-232).  Dr. Boxer reported that on several occasions plaintiff became tearful when talking about his physical

9

limitations and how they affect his ability to work and function. (AR 236).  Plaintiff indicated

that "it's easy" to concentrate while he reads. (AR 234).  The results of the MMPI-2 testing was

"suggestive of an individual who is focused on worries about his physical health.  Testing did

not provide evidence of substance abuse related to problems or behaviors.  There was no

evidence of significant impulse or behavioral control deficits." (AR 235).

Dr. Boxer's diagnosis was "Mood disorder due to Chronic Pain, With Depressive

Features." (AR 235).  Dr. Boxer provided a Global Assessment of Functioning ("GAF") of 65,

noting "[s]ome mild depressive symptoms, but generally functioning pretty well from the

psychiatric perspective." (AR 236).  Dr. Boxer further reported that plaintiff "describes a level of

depression that fluctuates depending on his degree of pain.  He attributes his limitations of

functioning to his pain and limited range of motion due to orthopedic problems, not to

depression.  He reports he is able to read books every day with no problems concentrating on the

material.  He reports that his appetite, energy level, and motivation are unimpaired.  He states

that he would be much more involved in activities that he used to enjoy but for the physical

limitations that he describes." (AR 236).  Dr. Boxer also found that "[o]n mental status

examination, there was no evidence of significant impairment in attention span, concentration or

memory." (AR 236).  Dr. Boxer further advised, "I do not find evidence of significant

psychologically-based impairment in observable activities. Mr. Smith does report significant

physically-based impairment in activities, but evaluation of possible physical impairments is

beyond the scope of a psychiatric examination." (AR 237).

Dr. Zollett responded to questions asked by Hartford in writing on June 2, 2004. (AR

256).  Dr. Zollett listed the current diagnoses as "Chronic back pain s/p lumbar laminectomy,

chronic shoulder, elbow, ankle pain, depression, hypogonadism, anxiety, hyperlipidemia." (AR 256).  Dr. Zollett noted some improvement with switching to Lexapro from Remeron, but plaintiff "still has depression and anxiety." (AR 256).  Dr. Zollett listed the following repercussions from plaintiff's gastric bypass surgery: fatigue, nausea, occasional vomiting, frequent bowel movements, occasional hypotension, and decreased protein levels. *Id*.  Dr. Zollett indicated that plaintiff could not sit for 6-8 hours per day, could not lift up to 10 pounds and could not reach or work overhead occasionally. (AR 256).  Dr. Zollett stated that plaintiff would be prevented from performing a sedentary occupation because of "chronic pain due to the multiple physical conditions.  He also has emotional components that contribute to his inability to work." (AR 257).

On June 10, 2004, Dr. Vitols wrote to Hartford in response to various questions they had presented to him. (AR 255).  Plaintiff's current diagnoses were reported as: "Right shoulder; dislocation, strain/sprain, torn rotator cuff, impingement syndrome and arthropathy. Chronic lumbar strain/sprain; lumbago; disc displacement, degenerative joint disease and lumbar HNP. Status-post left elbow fracture." (AR 255).  Plaintiff's functional abilities were described as follows:

> Patient has limited use of his right upper extremity due to weakness and limited ROM that is permanent.  In addition he has chronic pain in the low back and legs due to the above mentioned diagnoses.  He has limited ROM of the lumbar spine, he is unable to do any repetitive bending, twisting at the waist.  He has a weight limit of #20-#25 on an occasional basis.  He uses a cane on a regular basis due to weakness in the legs.  He is unable to do any repetitive work at or above shoulder height due to shoulder conditions.  Bending and stooping would also markedly aggravate his condition.

(AR 255).  Dr. Vitols also reported that plaintiff was unable to sit for 6-8 hours everyday with breaks due to the above mentioned conditions and restrictions. *Id*.  He also opined, in response to

question seven, that plaintiff "may be able to do some part-time sedentary work with restrictions." *Id*. (Emphasis in the original).

In a letter dated July 19, 2004 from Dr. Vitols to Hartford, Dr. Vitols states, "Please be advised a typographical error is present in the enclosed reference letter of 6-10-04. Question seven should read, 'The patient is unable to do even sedentary type of work.' I apologize for this error. Please feel free to contact my office for any further clarification." (AR 207).

Both Drs. Zollett and Melchior were asked by Hartford to reply to Dr. Boxer's Independent Psychiatric Examination report. On July 22, 2004, Dr. Melchior stated:

> Mr. Smith continues to experience the following symptoms related to the above: impaired cognitive skills (concentration and focus), a low stress tolerance, feeling of guilt and worthlessness, impaired sleep, fatigue, and chronic pain. These symptoms result in a number of restrictions or limitations, such as difficulty with: understanding and remembering detailed instructions, maintaining attention and concentration for extended periods, and limited ability to complete a normal work day and work week without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods. Additional restrictions result from the side effects of his pain medications which further impairs his ability to concentrate. However, if Mr. Smith does not take his pain medication, the pain is more disruptive to his cognitive abilities.
>
> In summary, Mr. Smith is a fifty-two year old man with significant physical and psychological limitations due to his industrial injuries. He has ongoing restrictions due to his physical condition, chronic pain, and psychological conditions (the physical condition per medical records). Given the combination of restrictions resulting from his injuries, Mr. Smith should be considered disabled from gainful employment.

(AR 221-22).

Dr. Zollett reported that plaintiff "has depression, anxiety and mood swings that are directly related to his chronic pain due to his multiple physical injuries. I feel that medication and therapy will somewhat help Mr. Smith but I feel this will be a lifetime condition for him. I

feel he is totally and permanently disabled from all gainful employment due to his physical and psychological conditions." (AR 220).

On July 20, 2004, Dr. John Brannan, an orthopedist who is Board-Certified in Physical Medicine, Rehabilitation, and Electro-Diagnostic Medicine, performed an independent medical evaluation of plaintiff. (AR 217).  On examination, Dr. Brannan reported that "[r]eview of systems is positive for weight loss, weakness, impaired sleep, impaired sexual function, chronic pain and general fatigue." (AR 217(a)).  Dr. Brannan reported "symptom magnification on exam today as he displayed verbal and non-verbal gestures during the course of the examination at times." (AR 217(c), 218).  However, Dr. Brannan noted no evidence of malingering. (AR 218).  Current medications included a daily dose of 10 mg. of Lexapro; 40 mg. of Nexium; 1 mg. of Lorazepam twice a day; Transdermal Fentanyl; 40 mg. of Lasix; Ibuprofen 3 times a day; and Hydrocodone. (AR 217(a)).  Dr. Brannan believed plaintiff's right shoulder still had some anterior impingement of the supraspinatus muscle. (AR 218).  After examining plaintiff and reviewing his medical history, Dr. Brannan concluded, "I believe given his constellation of musculoskeletal problems that the sedentary work category would be most appropriate. Some light work activities could be possible but especially in regards to the right shoulder, lifting above the level of the shoulder would be difficult.  I believe my findings are consistent with those of his treating orthopedist.  I disagree with his primary care physician that he is totally disabled.  I do believe he has the functional capability to work full-time." (AR 218).

On July 28, 2004, Hartford enclosed a copy of Dr. Brannan's report to Dr. Vitols for review and requested verification of whether Dr. Vitols agreed with the conclusions set forth

therein. (AR 206).  On August 2, 2004, Dr. Vitols faxed the letter back to Hartford checking a box which indicated agreement with Dr. Brannan's results. (AR 206).

On August 20, 2004, Dr. Garrido-Castillo and Dr. Wagner discussed the additional medical evidence from Dr. Boxer and Dr. Brannan, and the responses of Drs. Melchior and Zollett, and issued addenda to their review reports. (AR 197-198).  Dr. Garrido-Castillo opined, "On the basis of new information available, I must conclude that from a psychological standpoint there do not seem to be significant symptoms affecting this claimant's functioning." (AR 203). Dr. Garrido-Castillo concluded, "I do not see any evidence that psychological symptoms are in a significant way limiting this claimant's ability to return to work." (AR 203).  Dr. Wagner wrote that "[n]either Dr. Boxer nor Dr. Brannan reported any limitations due to medications. Generally individuals accommodate to psychotropic and narcotic medications in a short period of time." (AR 197).  Dr. Wagner concluded, "Based on all the available medical evidence, Mr. Smith is functional on a full-time basis at a sedentary level with the restrictions of limited standing and walking due to the residual effects of Mr. Smith's prior orthopedic intervention. . . . Mr. Smith is functional at a sedentary level with the restrictions of no constant repetitive overhead use of the right shoulder, limited standing and walking, and the ability to change posture when needed." (AR 198).

Hartford then conducted an employability analysis on September 8, 2004. (AR 168-80). Rehabilitation Case Manager Larry Underwood, M.S., C.R.C., conducted a "Job-Person Match … utilizing OASYS (Occupational Access System), a computerized job matching system that cross references an individual's qualifications profile with 12,741 occupations classified by the

U.S. Department of Labor in the 1991 Dictionary of Occupational Titles (DOT)." (AR 168-69).

Mr. Underwood reported the results of the analysis as follows:

> Seventeen (17) unskilled occupations were identified by the OASYS software program that appear to be within the claimant's current functional abilities, education, training, employment history, hobbies, interests and special skills as well as the target gainful wage. None were at the OASYS "Closest" or "Good" levels. In order to identify unskilled occupations that the claimant might engage in, OASYS' "Fair" and "Potential" levels were utilized. Seventeen (17) unskilled occupations were identified. Two (2) positions were selected for further consideration. Based on the National ORS Wage Data (2002) and 2002 National Census Median Wage Data, the median monthly wages ranged from $1982.93/month to $2048.80/month for the two selected occupations and equal or exceed the targeted gainful wage. It is the professional opinion of this Rehabilitation Case Manager that the two (2) occupational alternatives listed below are compatible with the claimant's current functional abilities, education, training, employment history, hobbies, interests and special skills as well as the target gainful wage.

(AR 169).

On November 10, 2004, Hartford wrote to plaintiff to advise that it had determined that he was not disabled from any occupation. (AR 161).  Plaintiff requested an appeal of the decision (AR 155) and enclosed a letter form Dr. Zollett dated November 16, 2004. (AR 156).

That letter stated:

> I am writing to you to assist the above-stated patient in his appeal of your denial of long-term disability benefits in your letter dated November 10, 2004.  It is my professional opinion that Marvin Smith is permanently and totally disabled from all gainful employment.  This decision is based on his chronic pain from all of his physical disabilities and injuries.  Mr. Smith suffers from depression, anxiety and mood swings as a result of his chronic pain and his difficulty to function on a daily basis.  I feel the decision should be reversed as soon as possible.  If I can be of any further assistance please contact me at my office.

(AR 156).

Hartford denied the appeal, finding plaintiff is not prevented from performing the essential duties of any occupation. (AR 88).  Although it does not appear in his denial letter,

15

the appeals specialist's notes state that "[i]n light of the [restrictions and limitations]
recommended by Dr. Wagner, it is unclear whether the job of Patcher identified by the
Employability Analysis would be consistent with limited use of the right shoulder and the left
elbow, as this occupation requires frequent reaching, handling and fingering." (AR 92-95).  But
the surveillance system monitor job "is within his qualifications and medical abilities." (AR 95).

Plaintiff commenced an action in this Court on April 28, 2005 setting forth claims for a
wrongful denial of disability benefits under ERISA and for state law breach of contract. (Doc. 1,
Complaint, Counts One and Two).  Thereafter, plaintiff voluntarily dismissed Count II of the
Complaint, recognizing that his breach of contract claim is preempted by ERISA. (Doc. 25 at 1).

## STANDARD OF REVIEW

In a denial of benefits action brought under § 1132(a)(1)(B), the Court must base its
review of the merits solely upon the underlying administrative record; the Court may not
consider any evidence that was not presented to the Plan administrator. *Wilkins v. Baptist
Healthcare Sys., Inc.,* 150 F.3d 609, 619 (6th Cir. 1998)(Gilman, J., concurring).  The Court
"may consider evidence outside of the administrative record only if that evidence is offered in
support of a procedural challenge to the administrator's decision." *Id.*  The Sixth Circuit has
determined that summary judgment procedures are inconsistent with the appropriate standard of
review for recovery of benefits claims under ERISA. *Id.*  Instead of using the summary judgment
mechanism, the Court must review the administrative record applying either a *de novo* or an
arbitrary and capricious standard of review, as appropriate, and render a decision on the merits

16

by determining whether the denial of benefits was proper under the terms of the Plan. *Id.* at 619-

20; *Smith v. Aetna U.S. Healthcare*, 312 F. Supp.2d 942, 949 ( S.D. Ohio Mar. 29, 2004).

A beneficiary may challenge an ERISA plan administrator's decision to deny benefits

under 29 U.S.C. § 1132(a)(1)(B).  When a beneficiary raises such a challenge, the Court must

review the administrator's decision under a *de novo* standard, unless "the benefit plan in question

gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or

to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

(1989).  Where the plan grants discretionary authority to the administrator, the Court must apply

the highly deferential arbitrary and capricious standard to its review of the benefits decision.

*Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 380 (6th Cir. 1996).  While the plan need

not include "magic words" such as the term "discretionary" or some other specific terminology,

in order to vest the plan administrator with discretion, the grant of discretionary authority must

be "clear" in order to trigger the arbitrary and capricious standard of review. *Hoover v. Provident

Life & Acc. Ins. Co.,* 290 F.3d 801, 807 (6th Cir. 2002); *Perez v. Aetna Life Ins. Co.,* 150 F.3d

550, 555 (6th Cir. 1998)(*en banc*).

Under an arbitrary and capricious standard, the Court must affirm the administrator's

decision if the record evidence establishes a reasonable basis for the decision. *Davis v. Kentucky

Fin. Cos. Retirement Plan*, 887 F.2d 689, 693-94 (6th Cir. 1989), *cert. denied*, 495 U.S. 905

(1990).  Under the *de novo* standard of review, however, the Court must consider "the proper

interpretation of the plan and whether an employee is entitled to benefits under it" based solely

on the record that was before the administrator. *Perry v. Simplicity Engineering*, 900 F.2d 963,

966-67 (6th Cir. 1990).  *See also Lake v. Metropolitan Life Ins. Co.*, 73 F.3d 1372, 1376 (6th Cir.

1996); *Wulf v. Quantum Chemical Corp.*, 26 F.3d 1368, 1372 (6th Cir. 1994). *De novo* review simply means a determination "whether or not the Court agrees with the administrative decision based on the record that was before the administrator." *Perry*, 900 F.2d at 966.

The parties agree that the arbitrary and capricious standard of review applies in this case. (Doc. 20 at 3; Doc. 23 at 13).

Under the arbitrary and capricious standard of review, this Court must determine whether Hartford's termination decision "is the result of a deliberate, principled reasoning process and . . . is supported by substantial evidence." *Glenn v. Metlife*, 461 F.3d 660, 666 (6th Cir. 2006) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)). The Court must determine whether Hartford's decision was rational in light of the Plan's provisions. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003); *Shelby County Health Care Corp. v. Southern Council of Industrial Workers Health and Welfare Trust Fund*, 203 F.3d 926, 933-34 (6th Cir. 2000). The plan administrator's decision will be upheld if the administrative record can support a "reasoned explanation" for the decision. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005) (citing *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)). The "explanation must be consistent with the quantity and quality of the medical evidence that is available on the record." *Moon*, 405 F.3d at 381 (internal quotation and citation omitted).

The arbitrary and capricious standard of review is not a mere rubber stamp of the plan administrator's decision. *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). As the Sixth Circuit stated in *McDonald*:

> [T]he district court had an obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and

18

> capriciously in making ERISA benefits determinations. This obligation inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues. Otherwise, courts would be rendered to nothing more than rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence--no matter how obscure or untrustworthy--to support a denial of a claim for ERISA benefits.

347 F.3d at 172. "Deferential review is not no review, and deference need not be abject."

*McDonald*, 347 F.3d at 172 (internal quotation and citation omitted). In determining whether

Hartford's termination decision was arbitrary and capricious, the Court is limited to reviewing

the materials in the administrative record, *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433-34

(6th Cir. 1998), and the evidence of bias offered by plaintiff in support of his procedural

challenge to the administrator's decision. *Wilkins*, 150 F.3d at 619.


# OPINION

In support of its decision to terminate plaintiff's claim for long-term disability benefits,

Hartford asserts that the weight of the medical evidence supports its decision and that it offered a

reasoned explanation for the termination of plaintiff's long-term disability benefits. Hartford

cites to the reports of Dr. Boxer, an independent examining psychiatrist, and Dr. Garrido-

Castillo, a licensed psychologist who reviewed all of the medical and psychological records, who

opined that plaintiff was capable of performing sedentary occupations based on his

psychological conditions. (AR 230-237; 199, 203). Hartford also points to the report of Dr.

Brannan, whose examination of plaintiff demonstrated that plaintiff had the capacity to perform

full-time sedentary work with restrictions (AR 217-219) and the statement of Dr. Vitols who

indicated agreement with Dr. Brannan's conclusions. (AR 206). Finally, Hartford cites to the

review of Dr. Wagner, a board-certified physiatrist who reviewed all the medical evidence and

opined that plaintiff could function at a sedentary level with restrictions on standing, walking, alternating positions, and repetitive use of right shoulder overhead. (AR 193-198).  Hartford contends its reliance on the opinions of one treating physician, two separate independent medical examiners, and two separate independent medical reviewers in denying benefits, all of whom opined that plaintiff's physical and mental conditions did not preclude the performance of a range of sedentary full-time work, was reasonable and should be upheld by the Court.

Plaintiff argues that Hartford's termination decision was arbitrary and capricious because Hartford failed to take into account plaintiff's chronic pain and the effects of his medications on his ability to work; that Hartford's employability analysis does not follow the terms of the Plan policy and is flawed; that Hartford, as administrator and payor, has a conflict of interest which the court should consider; and that University Disability Consortium (UDC)'s physicians who are regularly retained by Hartford have a clear incentive to find in Hartford's favor.

## I.  <u>Hartford's Employability Analysis</u>

Plaintiff contends that Hartford's employability analysis fails to follow the terms of the Plan and is flawed.  The Court disagrees.  Contrary to plaintiff's argument, while the patcher job was questioned by the appeals officer, it was not eliminated because of its physical requirements. The appeals officer opined that it was "unclear" whether the job would be consistent with limited use of the right shoulder and the left elbow, but ultimately deferred to the Rehabilitation Case Manger's assessment that the job was one for which plaintiff was qualified. (AR 95).

Nor does the Court agree that the wage data utilized by the analyst was for a different job, *i.e.*, gaming surveillance officer and gaming investigator. (AR 177).  A review of the

20

Administrative Record shows the jobs are one in the same, with the gaming surveillance officer position being a subset of the more general surveillance system monitor position. (AR 175).[2]

Finally, plaintiff takes issue with the analyst's application of a 3% increase to the available wage data, contending that such action was done pursuant to a "clinical resource manual" and not the Plan which governs plaintiff's claim for benefits in this matter. However, even without the application of the 3% increase, the wage information provided by Hartford at page 11 of its memorandum in opposition to plaintiff's motion for judgment on the record shows that the surveillance system monitor/gaming surveillance officer position does provide a sufficient salary to meet the wage criteria of the Plan. (Doc. 26 at 10-11). Plaintiff has not refuted these calculations. Plaintiff did not provide any vocational evidence and the Employability Analysis provided by Hartford is the only such evidence in the record. The Court determines that Hartford's reliance on the Employability Analysis is supported by substantial evidence. *Glenn*, 461 F.3d at 666.


## II. Conflict of Interest

Plaintiff contends that Hartford, as administrator and payor, has a conflict of interest which the Court should consider in conducting its review. In addition, plaintiff alleges that University Disability Consortium (UDC)'s physicians are regularly retained by Hartford and have a clear incentive to find in Hartford's favor.

---

[2]The Occupational Information Network (O*Net Online)'s listing for 33-9031.00 - Gaming Surveillance Officers and Gaming Investigators includes a "sample of reported job titles" including "Surveillance Operator, Security Officer, Surveillance Observer, Surveillance Officer, Surveillance Agent, Observer, Surveillance Monitor, Surveillance Supervisor, Surveillance Technician, Surveillance Inspector." Found at http://208.56.213.87/dot.html.

Where, as here, Hartford "is authorized both to decide whether an employee is eligible for benefits and to pay those benefits[,][t]his dual function creates an apparent conflict of interest." *Glenn v. MetLife and Long Term Disability Plan for Associates of Sears, Roebuck and Company*, 461 F.3d 660, 665-66 (6th Cir. 2006). The conflict of interest occurs because the company incurs a direct expense as a result of the allowance of a claim and benefits directly from the denial or discontinuation of a claim. *Killian v. Healthsource Provident Administrators*, 152 F.3d 514, 521 (6th Cir. 1998). A conflict of interest, however, does not alter the standard of review. *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir. 1998). The existence of a conflict of interest, therefore, is weighed as one factor in determining whether Hartford's decision to terminate plaintiff's long-term disability benefits was arbitrary and capricious. *Id.*

In this regard, plaintiff appears to argue that Hartford's conflict of interest is exacerbated because the UDC physicians that Hartford employs to do file reviews receive a substantial number of claims referrals and income from Hartford. (Doc. 20, Exh. A). Plaintiff asserts that the number of claims referred and dollars paid significantly increased from 2002 to 2004, and that of 16 reported cases in which Hartford used UDC to perform reviews, each UDC physician determined the claimant was not disabled. (Doc. 20, Exh. B). Plaintiff also contends that Hartford's nurse case manager utilized "leading questions" with the IME, Dr. Brannan, aimed at suggesting that plaintiff has the functional capacity to work full-time.

"[P]hysicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers['] money and preserve their own consulting arrangements." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003) (citation and quotation marks omitted). The Sixth Circuit has acknowledged that "a plan

administrator, in choosing the independent experts who are paid to assess a claim, is operating under a conflict of interest that provides it with a 'clear incentive to contract with individuals who were inclined to find in its favor that [a claimant] was not entitled to continued [disability] benefits.'" *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F.3d 501, 507-508 (6th Cir. 2005) (quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005).  In applying the arbitrary and capricious standard, this Court must factor this possible conflict of interest into its decision. *Calvert*, 409 F.3d at 292.

In *Kalish*, the Sixth Circuit was unable to conclude that the defendant acted arbitrarily and capriciously in crediting the opinion of the reviewing physician over that of the treating physician where the plaintiff only offered conclusory allegations of bias and failed to "present any statistical evidence to suggest . . . [the reviewer] has consistently opined that claimants are not disabled." 419 F.3d at 508.

In the instant case, Hartford, as both the decision maker and the payer of claims, faces a potential conflict of interest when determining whether to grant or deny a disability claim. Likewise, the UDC doctors retained by Hartford, Drs. Wagner and Garrido-Castillo, may face a similar conflict, but there is no evidence that the decisions of the doctors were affected by a fear of losing future consulting contracts with Hartford.  In addition, the sixteen cases cited by plaintiff showing a determination of "not disabled" by UDC physicians do not constitute significant evidence in support of a conflict of interest.  As Hartford points out in its brief, of the total of 5,185 claims from 2002 through 2004 that UDC reviewed, only 16 such claims resulted in litigation.  Such a small number does not support plaintiff's claim of bias.

23

Nor do the questions posed to Dr. Brannan by Hartford's nurse case manager suggest a conflict of interest.  Question 11 merely asked Dr. Brannan if he agreed with the physician reviewer that plaintiff had the capability to work full-time, and Question 13 advised that Hartford was unable to obtain restrictions and limitations level with his chronic problems and asked for Dr. Brannan's opinion as to his functional abilities. (AR 252).  Such questions do not show bias on Hartford's part.  Because the mere possibility of a conflict of interest is not enough to show bias, the Court declines to find that the doctors retained by Hartford were improperly affected by a conflict of interest.

## III.  **Disability Decision**

Plaintiff contends Hartford failed to take into account plaintiff's chronic pain and the effects of his medications on his ability to work.  Plaintiff asserts that each of the physicians involved in this case, whether treating, examining or reviewing, acknowledged that plaintiff suffers pain from his numerous orthopedic injuries and impairments.  In addition, the medical evidence shows the interconnection between plaintiff's chronic pain and limitations and his depression and anxiety.  Plaintiff's primary care physician, Dr. Zollett, and treating psychologist, Dr. Melchior, concluded that plaintiff was unable to perform even at a sedentary level of work because of the combination of chronic pain and mental conditions. (AR 257, 156, 221-222).  Plaintiff's treating orthopedist, Dr. Vitols, also opined that plaintiff was unable to perform sedentary work. (AR 207, 208).  Plaintiff argues that while Hartford's examining and reviewing physicians acknowledged plaintiff's chronic pain, they failed to consider the impact of such pain on his ability to perform full-time work.

24

Hartford contends that it did not ignore the impact of plaintiff's pain on his ability to work or refuse to credit the opinions of plaintiff's treating doctors, but found that such opinions were outweighed by the opinions of the examining physicians, Drs. Brannan and Boxer, the reviewing physicians, Drs. Garrido-Castillo and Wagner, and Dr. Vitols' communication of August 2, 2004.  Hartford contends that its reliance on these physicians' opinions over those of plaintiff's treating physicians in determining plaintiff could perform some sedentary occupations with restrictions was reasonable.  *See McDonald v. Western-Southern Life Ins. Co.,* 347 F.3d 161, 169 (6th Cir. 2003) (stating that when a plan administrator chooses to rely on the medical opinion of one doctor over another, that decision is rarely arbitrary and capricious).  Hartford offers several reasons for its decision to reject the opinions of Drs. Zollett and Melchior, whose limitations were at odds with those of the other physicians.  Dr. Brannan noted "symptom magnification" during plaintiff's examination (AR 217(c), 218) and, based on his examination, concluded, "I believe given his constellation of musculoskeletal problems that the sedentary work category would be most appropriate.  Some light work activities could be possible but especially in regards to the right shoulder, lifting above the level of the shoulder would be difficult.  I believe my findings are consistent with those of his treating orthopedist.  I disagree with his primary care physician [Dr. Zollett] that he is totally disabled.  I do believe he has the functional capability to work full-time."  (AR 218).  When Dr. Brannan's report was forwarded to Dr. Vitols, plaintiff's treating orthopedic surgeon, Dr. Vitols reviewed it and checked a spot on a form indicating that he agreed with the conclusions set forth in Dr. Brannan's report. (AR 206).  In addition, Dr. Boxer, the examining psychiatrist, acknowledged plaintiff's chronic pain (AR 236), but found no evidence of significant impairment in attention span, concentration, or

memory after psychological testing and mental status examination. (AR 236).  The reviewing

doctors, Drs. Garrido-Castillo and Dr. Wagner, based on all the medical evidence, including the

history and physical examination report of Dr. Brannan which provided "the most complete

evaluation . . . in the record" (AR 196) determined plaintiff was capable of functioning at the

sedentary level with restrictions of no constant repetitive overhead use of the right shoulder,

limited standing and walking, and the ability to change posture when needed," restrictions based

on plaintiff's prior orthopedic intervention which necessarily included consideration of

plaintiff's pain. (AR 198).  Hartford contends that its decision to terminate benefits was fully

supported by this evidence.

      This Court's review of the Administrative Record evidence before Hartford, and as

informed by Hartford's apparent conflict of interest, demonstrates that Hartford's expressed

reasons for terminating plaintiff's benefits do not support the action taken.  As noted above, the

Court's review under the arbitrary and capricious standard is not a mere rubber stamp of the Plan

administrator's decision.  The Court must review "the quality and quantity of the medical

evidence and the opinions on both sides of the issues." *McDonald,* 347 F.3d at 172.  Moreover,

the Court must take into account the existence of a conflict of interest that results when, as in this

case, the plan administrator who decides whether an employee is eligible for benefits is also

obligated to pay those benefits.  Against this backdrop, the Court's review indicates that

Hartford, in evaluating the effect of plaintiff's chronic pain and resultant mental conditions on

his ability to work, arbitrarily refused to credit the reliable evidence from plaintiff's treating

doctors, failed to give appropriate weight to the Social Security Administration's decision that

plaintiff is totally disabled based on the combination of his physical and mental impairments, and failed to consider the effect of plaintiff's prescription medications on his ability to work.

Plaintiff's treating doctors have consistently opined that he is disabled from the combination of his physical and mental impairments. The Court acknowledges that pursuant to *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 825 (2003), Hartford was not obligated to give deference to plaintiff's treating physicians' opinions over the opinions of its own consulting physicians. But, "[b]y the same token, it may not arbitrarily repudiate or refuse to consider the opinions of a treating physician." *Glenn*, 461 F.3d at 671, citing *Black & Decker Disability Plan,* 538 U.S. at 834.

In this regard, Dr. Zollett, plaintiff's primary care physician, opined that plaintiff could not perform sedentary work because of "chronic pain due to the multiple physical conditions. He also has emotional components that contribute to his inability to work." (AR 257). Dr. Zollett further concluded that plaintiff was "permanently and totally disabled from all gainful employment. This decision is based on his chronic pan from all of his physical disabilities and injuries. Mr. Smith suffers from depression, anxiety and mood swings as a result of his chronic pain and his difficulty to function on a daily basis." (AR 156).

Dr. Melchior, plaintiff's treating psychologist, stated that plaintiff has "significant physical and psychological limitations due to his industrial injuries. He has ongoing restrictions due to his physical condition, chronic pain, and psychological conditions (the physical condition per medical records). Given the combination of restrictions resulting from his injuries, Mr. Smith should be considered disabled from gainful employment." (AR 221-222). Dr. Melchior's

opinion is well-supported by the contemporaneous therapy notes contained in the record. (AR 389-399).

It is undisputed that plaintiff's depression and anxiety are directly related to the chronic pain from his numerous physical impairments. (AR 220, 221-222, 235, 257, 352, 480).  In fact, the UDC psychologist retained by Hartford described the "intertwined nature of mood, anxiety, and chronic pain" (AR 351) and Dr. Boxer reported that the "severity of depression correlates with the severity of his reported pain." (AR 237).  Yet, incredibly, and contrary to the opinions of Drs. Zollett and Melchior, Hartford determined that plaintiff has absolutely no limitations from the depression and anxiety resulting from his chronic pain.  The only evidence supporting this proposition is the one-time examination of Dr. Boxer, who met with plaintiff for two hours, administered a standard psychological test, and concluded plaintiff did not have "significant psychologically-based impairment in physical activities" (AR 238) and Dr. Garrido-Castillo's adoption of this conclusion. (AR 202).  However, Dr. Melchior and his associates had the benefit of a long-term treatment relationship with plaintiff, having treated him for over one and one-half years, much of the time during weekly therapy sessions.  Dr. Zollett has treated plaintiff for over two years. (AR 220, 156).  Plaintiff was treated with various psychiatric medications with limited success (AR 220) and Dr. Zollett related plaintiff's depression, anxiety, and mood swings directly to his chronic pain and multiple physical injuries. (AR 220).  The Administrative Record is replete with evidence showing plaintiff's levels of psychiatric functioning varied over time. (AR 360, "some relief with Lexapro, still has bad days"; AR 236, "level of depression . . . fluctuates depending on degree of pain"; AR 389-399, therapy notes).  It was simply not rational for Hartford to ignore the opinions of Drs. Melchior and Zollett, who had the benefit of a long-

28

term treating relationship with plaintiff, in favor of a single, two-hour visit with Dr. Boxer. *Glenn*, 461 F.3d at 674.  Hartford's complete failure to take into account the variations in plaintiff's levels of functioning in determining the severity of his psychiatric impairments over time was not rational.  Dr. Boxer's and Dr. Garrido-Castillo's opinions are not substantial evidence supporting Hartford's decision that plaintiff's mental condition did not impact his ability to work in view of the long-standing treatment plaintiff received from his treating physicians and, as will be discussed below, the Social Security Administration's determination that plaintiff was totally disabled based on the combination of his physical and mental impairments.  For Hartford to conclude that plaintiff had absolutely no limitations on his ability to work as a result of his well-documented and long history of depression and anxiety resulting from his chronic pain is not consistent with the quantity and quality of the medical evidence in the record. *Moon*, 405 F.3d at 381.

In addition, plaintiff's treating orthopedic surgeon, Dr. Vitols, reported on June 14, 2004 that plaintiff has chronic pain in the low back and legs and opined that plaintiff "is unable to sit for 6-8 hours everyday with breaks" due to his numerous impairments. (AR 208).  Dr. Vitols also concluded that plaintiff may only "be able to do some part-time sedentary work with restrictions." (AR 208) (emphasis in the original).  The following month, Dr. Vitols clarified his previous report and stated that plaintiff was "unable to do even sedentary type of work." (AR 207).  These reports are consistent with the numerous medical records and reports submitted by Dr. Vitols in the Administrative Record. (AR 478-499).  Hartford, in its decision finding plaintiff could in fact perform a limited range of sedentary work, instead credited a one-paragraph facsimile statement sent by Dr. Vitols to Hartford on August 2, 2004. (AR 206).  Dr. Vitols

placed an "x" on the "agree" line in response to Hartford's statement: "Enclosed is a copy of the

IME report on your patient, Marvin Smith.  Please respond to the results whether you agree to

the results or not. . . ." (AR 206).  Up to that point, Dr. Vitols consistently found plaintiff was

unable to perform full-time sedentary work.  Hartford gave no weight to Dr. Vitols' opinions of

disability, but instead relied on the August 2, 2004 statement.

      The Sixth Circuit in *Glenn* faced a very similar situation:

> Even more perplexing than the plan administrator's failure to consider the award
> of Social Security benefits is the persistent failure to give any weight to Dr.
> Patel's letters of July 22, 2002, and February 12, 2003, in which he clearly stated
> that he did not believe Glenn was capable of returning to work, sedentary or
> otherwise. This omission stands in stark contrast to the heavy reliance MetLife
> placed in its brief on the "physical capacity assessment" form that MetLife
> provided to Dr. Patel and that he filled in and signed on March 13, 2002. On the
> form, Dr. Patel indicated that his patient could sit for eight hours a day, stand for
> four hours, and walk for two hours. He also checked yes when asked, "Do you
> believe Ms. Glenn is able to work in a sedentary physical exertion level
> occupation?" That information is so inconsistent with other medical evidence and
> detailed reports supplied by Dr. Patel over a period of three years that it can best
> be described as aberrational.

*Glenn*, 461 F.3d at 669.  The Court went on to hold that MetLife's failure to offer an explanation

for crediting the brief form filled out by the treating doctor while overlooking his detailed reports

was a factor reflecting arbitrary and capricious decision-making. *Id*. at 674.

      Likewise, Hartford rejected Dr. Vitols' more detailed reports while crediting the single

inconsistent check off form.  The UDC physicians employed by and relied upon by Hartford

failed to acknowledge Dr. Vitols' detailed responses of June 10, 2004 to Hartford's list of

questions on plaintiff's functionality, including Dr. Vitols' opinion that plaintiff "is unable to sit

for 6-8 hours everyday with breaks due to the above mentioned conditions and restrictions"

which would preclude sedentary work. (AR 187-198, AR 208).  Although Hartford's denial

letter acknowledged Dr. Vitols July 19, 2004 opinion that plaintiff was unable to perform sedentary work, it ultimately credited the August 2, 2004 facsimile check off form without offering any explanation for its failure to give any weight to Dr. Vitols' more detailed reports. (AR 89). In light of the Sixth Circuit's decision in *Glenn*, this factor further persuades the Court that Hartford's decision was arbitrary and capricious.

A related matter that further persuades the Court that Hartford's decision-making in this case was not the result of a principled and deliberative reasoning process is Hartford's motivation for sending plaintiff for an independent medical examination to Dr. Brannan in the first place. Hartford's claims examiner's note from May 27, 2004, prior to Dr. Brannan's IME, states, "He [plaintiff] does have functionality to do sedentary according to the medical I reviewed in claim. It appears he is doing well with gastric bypass. *I will need to speak with specialist in regards to an IME if I cannot get Dr. Vitols to agree on sedentary work*. There has never been approach to MD in this regards." (AR 53) (emphasis added). On June 1, 2004, Hartford sent Dr. Vitols a detailed list of questions soliciting information on plaintiff's functional abilities tailored to the issue of whether plaintiff was able to perform sedentary work. (AR 264). Dr. Vitols responded to this letter on June 10, 2004. (AR 208). Dr. Vitols' responses to Hartford's questions reflected his conclusion that plaintiff was unable to perform sedentary work on a full-time basis. (AR 208). Only after Hartford received Dr. Vitols' report expressing his disagreement that plaintiff could do sedentary work was plaintiff was then sent to Dr. Brannan for an IME on July 20, 2004. (AR 217). This suggests that despite the medical evidence showing plaintiff was unable to perform sedentary work, Hartford nevertheless concluded otherwise and endeavored to reach a contrary conclusion.

31

An additional factor supporting the treating physicians' opinions of total disability based on the combination of plaintiff's physical and mental impairments is the Social Security Administration's decision finding plaintiff totally disabled. (AR 372-381).  However, Hartford failed to give consideration to the Social Security Administration's determination of total disability.  The Social Security Administration's disability decision is relevant to a court's determination of whether a decision to terminate ERISA benefits is arbitrary and capricious. *Glenn*, 461 F.3d at 667.  *See also Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294 (6th Cir. 2005) ("the SSA determination, though certainly not binding, is far from meaningless").  Where the Social Security Administration has determined an applicant is disabled, the Plan administrator's decision denying disability benefits can be considered arbitrary and capricious "especially where 'it is plainly evident that the Social Security standard for a disability determination is much more stringent than that required by [the defendant's] insurance policy.'" *Glenn,* 461 F.3d at 668, citing *Darland v. Fortis Benefits Ins. Co.*, 317 F.3d 516, 530 (6th Cir. 2003), *overruled on other grounds by Nord*, 538 U.S. 822 (2003).[3]

---

[3]Like the Plan in *Glenn*, the instant Plan awards disability benefits to an individual who is "prevented from performing one or more of the Essential Duties of Any Occupation," which is defined as "an occupation for which you are qualified by education, training or experience, and that has an earnings potential greater than an amount equal to the lesser of the product of your Indexed Pre-Disability Earnings and the Benefit Percentage and the Maximum Monthly Benefit shown in the Schedule of Insurance." (POL 19, 20).  Social Security disability insurance benefits are awarded only if the individual's impairment is of such severity that he "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives." 42 U.S.C. § 423(d)(2)(A). The Social Security determination does not take into account past earning or location of the applicant.  *See Glenn*, 461 F.3d at 668, n. 1.

In this case, plaintiff's Social Security decision is significant in the fact that the ALJ

found plaintiff's major depressive disorder and anxiety disorder to be severe[4] impairments,

causing moderate restrictions in concentration, persistence, and pace, and limiting plaintiff to

the performance of unskilled work. (AR 378, 379). The Social Security's "determination, at a

minimum, provides support for the conclusion that an administrative agency charged with

examining [plaintiff's] medical records found, as it expressly said it did, objective support for

[the treating physician's] opinion in those records." *Calvert v. Firstar Finance, Inc.*, 409 F.3d

286, 294 (6th Cir. 2005). In addition, Hartford benefitted from the grant of Social Security

benefits by requiring plaintiff to reimburse Hartford for an overpayment of benefits based on his

receipt of Social Security benefits. (AR 55, 59, 61). Where a plan administrator benefits

financially from the government's determination that a claimant is totally disabled, the

administrator must give appropriate weight to that determination. *Glenn*, 461 F.3d at 669.

Instead of giving appropriate weight to the disability decision of the Social Security

Administration, Hartford distorted the import of the Social Security decision to fit its termination

decision. For example, in its letter denying plaintiff's appeal,[5] Hartford references portions of

the Social Security decision in support of its decision to terminate plaintiff's benefits. First,

Hartford cites to a November 2002 independent mental status examination showing mild

---

[4]Under Social Security regulations, a severe impairment is one which significantly limits the physical or mental ability to perform basic work activities. 20 CFR §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 CFR §404.1521(b). An impairment will be considered nonsevere only if it is a "slight abnormality which has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

[5]Hartford's January 12, 2005 denial letter "should be the principal point of reference in [a] review of a challenged denial of benefits." *University Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 849 n. 7 (6th Cir. 2000).

depression and a GAF of 65. (AR 90).  Yet, Hartford ignores the fact that the ALJ ultimately

rejected this one-time assessment, finding plaintiff's "mental impairments result in vocationally

significant concentration deficits and limit him to unskilled work." (AR 379).  Second, Hartford

cites to the Social Security State Agency evaluators' finding "that despite [plaintiff's] combined

physical impairments, [he] retained the residual functional capacity for a range of light work, and

that they indicated their findings were not inconsistent with those of [his] treating physicians."

(AR 90).  What Hartford fails to disclose is that the ALJ rejected the findings of the State

Agency evaluators "as simply not consistent with the overall record" and stated that "greater

weight must be give to the well-supported assessment of the claimant's treating physician, Dr.

Vitols." (AR 379).  Finally, Hartford's denial letter states:

> In reaching the SSD decision, the Administrative Law Judge noted that your
> medical conditions "were treated, either surgically and/or medically, with good
> results and there is no conclusive showing that they occasion more than minimal
> vocational limitations in this case."  He concluded that "The evidence supports a
> finding that the claimant retains the residual functional capacity to perform a
> range of unskilled, sedentary work."

(AR 90).  This is a blatant distortion of the ALJ's findings.  The ALJ's reference to medical

conditions "treated, either surgically and/or medically, with good results and there is no

conclusive showing that they occasion more than minimal vocational limitations in this case"

refers to the ALJ's "severity" finding made at step two of the sequential evaluation process with

respect to plaintiff's knee, ankle, and angina impairments only. 20 C.F.R. § 404.1520; *Lashley v.*

*Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983).  In context, the ALJ's decision states:

> The undersigned has determined that the claimant has the following medically
> determinable severe impairments: degenerative disc disease of the lumbosacral
> spine; post-laminectomy syndrome; impingement syndrome, right shoulder;
> history of ulnar fracture, right elbow; major depressive disorder and anxiety
> disorder.  *The evidence also shows evidence of medically determinable conditions*

34

> *of the knee and ankle.  Additionally, he has been diagnosed with angina (Exhibit 16).  These conditions were treated, either surgically and/or medically, with good results and there is no conclusive showing that they occasion more than minimal vocational limitations in this case.  Accordingly, they are found to be non-severe.*

(AR 378) (emphasis added).  The implication from the language cited out of context in Hartford's denial letter is that the totality of plaintiff's impairments imposed "no more than minimal vocational limitations" on his ability to function, when in reality the Social Security Administration found plaintiff disabled based on the combination of his severe impairments of degenerative disc disease of the lumbosacral spine; post-laminectomy syndrome; impingement syndrome, right shoulder; history of ulnar fracture, right elbow; major depressive disorder and anxiety disorder.   Hartford's distortion of the Social Security decision finding plaintiff totally disabled "is yet another factor that can render the denial of further long-term disability benefits arbitrary and capricious." *Glenn*, 461 F.3d at 669 ("That MetLife apparently failed to consider the Social Security Administration's finding of disability in reaching its own determination of disability does not render the decision arbitrary *per se,* but it is obviously a significant factor to be considered upon review.").

    Finally, Hartford failed to consider the effect of plaintiff's medications on his ability to work.  Plaintiff's medications include Lexapro, Lorazepam, Ambien, Nexium, Transdermal Fentanyl (Duragesic), Lasix, Ibuprofen, and Hydrocodone. (AR 217(a), 365).  Plaintiff points out that the medications he is prescribed to control his pain include a potent synthetic opiate used to control severe chronic pain that does not respond to other medications. (Doc. 25 at 2).[6]   Dr. Melchior, plaintiff's treating psychologist, concluded that as a result of plaintiff's Pain Disorder

---

[6]*See* Duragesic, Physicians' Desk Reference, 58th ed. (2004), at page 1751.

Associated with both a General Medical Condition and Psychological Factors, Major Depressive

Disorder, and Anxiety Disorder-NOS, plaintiff has:

> impaired cognitive skills (concentration and focus), a low stress tolerance, feeling
> of guilt and worthlessness, impaired sleep, fatigue, and chronic pain. These
> symptoms result in a number of restrictions or limitations, such as difficulty with:
> understanding and remembering detailed instructions, maintaining attention and
> concentration for extended periods, and limited ability to complete a normal work
> day and work week without interruptions and to perform at a consistent pace
> without an unreasonable number and length of rest periods. *Additional*
> *restrictions result from the side effects of his pain medications which further*
> *impairs his ability to concentrate. However, if Mr. Smith does not take his pain*
> *medication, the pain is more disruptive to his cognitive abilities.*

(AR 221) (emphasis added).  Plaintiff also takes issue with Dr. Wagner's finding that "neither

Dr. Boxer nor Dr. Brannan reported any limitations due to medications" (AR 197) because

neither examiner was asked for an opinion on the matter.  Plaintiff also challenges Dr. Wagner's

statement that "[g]enerally individuals accommodate to psychotropic and narcotic medications in

a short period of time" (AR 197) as unsupported by any evidence.

Hartford disagrees that it failed to consider the effects of plaintiff's medications.

Hartford contends that the independent medical examiners expressly reviewed plaintiff's

medications, directly tested his ability to concentrate while on them, and concluded that

plaintiff's concentration was unaffected.  *See* Dr. Brannan's report at AR 217(a) and AR 217(c)

noting plaintiff's medications and concluding "there is no reason why he could not function 40

hours per week."; Dr. Boxer's report at AR 232 and AR 236 noting plaintiff's medications and

finding "no evidence of significant impairment in attention span, concentration or memory."

The Sixth Circuit recently addressed the issue of the failure to address prescription

medications on a claimant's ability to work in *Smith v. Continental Cas. Co.*, 450 F.3d 253 (6th

Cir. 2006):

In support of Smith's argument that the effects of her many medications should have been considered in her disability determination, she cites *Adams v. Prudential Ins. Co. of America,* 280 F. Supp 2d 731 (N.D. Ohio 2003). In *Adams,* the court found that the plan administrator's denial of Adam's disability benefits was arbitrary and capricious because the administrator failed to consider the effects of Adams' multiple medications on his ability to perform his job. *Id.* at 740. Like Smith, Adams was taking Oxycontin and other narcotic pain relievers to manage his symptoms. *Id.* Adams' personal physician opined that these medications would impede Adams' ability to work at any job. *Id.* However, Prudential's reviewing physician merely listed Adams' medications in his report without discussing any possible effects the drugs might have on Adams' ability to do his job.

Like Adams, Smith's personal physician opined that the effects of Smith's many medications would make it impossible for her to "function under any circumstances." However, in the peer review letter, Kaplan does not address Smith's medications except to list some of them and state that Dr. Dubal has "prescribed OxyContin, Vioxx, and Skelaxin and reported that 'she is getting (the) most benefit out of this medication without side effects.'" JA 179. In fact, Kaplan never saw the letter drafted by Van Bussum concerning Smith's medications at all, because CCC failed to forward it to him.

CCC argues that *Adams* is distinguishable, because Kaplan did address Smith's medications in his peer review report, as noted above. Further, CCC states that: "[a]ppellant had taken the vast majority of the medications listed by Dr. Van Bussum while she performed the duties of her occupation before claiming disability." Br. of Appellee at 47. CCC argues that the only new medications added since Smith claimed that she was disabled were "Trazadone, an anti-depressant, Toradol, a form of ibuprofen, and Pycnogenol, an anti-oxidant." *Id.*

We find CCC's argument unconvincing. CCC's failure to adequately consider the number and nature of the medications Smith was taking, its failure to have Dr. Van Bussum's letter evaluated by Kaplan coupled with Kaplan's cursory discussion and careful selection of a *single* comment in the pain specialist's progress note supports Smith's argument that her disability determination was arbitrary and capricious.

450 F.3d at 264-65.

Likewise, Hartford's failure to adequately consider the number and nature of plaintiff's medications persuades this Court that Hartford's decision was not the product of a principled and deliberative reasoning process. Contrary to Hartford's contention, neither Dr. Brannan nor Dr.

37

Boxer discussed the effect of plaintiff's medications on his ability to work.  In addition, Dr.

Wagner, the reviewing physiatrist, mentions Dr. Melchior's July 2004 letter[7] in her report, but

fails to acknowledge the side effects of plaintiff's pain medications specifically noted by Dr.

Melchior. (AR 197).  Nor does Dr. Wagner provide any support for her statement that

"[g]enerally individuals accommodate to psychotropic and narcotic medications in a short period

of time." (AR 197).  Dr. Garrido-Castillo does note Dr. Melchior's findings of side effects in his

report (AR 201), but he fails to address or discuss the issue of medication side-effects in the

Diagnosis and Discussion portion of his report.  Dr. Garrido-Castillo states only that

concentration and attention did not seem to be a problem during plaintiff's single, two hour exam

with Dr. Boxer. (AR 202-203).  Dr. Melchior certainly had the benefit of a long-term treatment

relationship with plaintiff and was in a better position to assess the effect of plaintiff's

medications on his ability to function.  The silence of the record on this issue cannot be

substantial evidence on which to disregard Dr. Melchior's opinion on the limitations caused by

plaintiff's medications.  Without any consideration or discussion of the impact of plaintiff's use

of multiple prescription drugs on his ability to perform a limited range of sedentary work, the

Court cannot say Hartford's decision that plaintiff was not disabled from "any occupation" is

supported by substantial evidence and reasonable under the circumstances. *Smith*, 450 F.3d at

265.

## CONCLUSION

In view of the above, the Court finds Hartford acted arbitrarily and capriciously when it

terminated plaintiff's claim for long-term disability benefits.  Hartford, in evaluating the effect of

---

[7]Dr. Wagner mistakenly attributes the letter to Dr. Farrell, an associate of Dr. Melchior.

plaintiff's chronic pain and resultant mental conditions on his ability to work, arbitrarily refused to credit the reliable evidence from plaintiff's treating doctors, failed to give appropriate weight to the Social Security Administration's decision that plaintiff is totally disabled based on the combination of his physical and mental impairments, and failed to consider the effect of plaintiff's prescription medications on his ability to work. The Court recommends that this matter be remanded to Hartford with directions to reinstate plaintiff's long-term disability benefits retroactive to the date on which they were terminated.

### IT IS THEREFORE RECOMMENDED THAT:

1. Plaintiff's motion for judgment on the administrative record (Doc. 20) be **GRANTED** and this matter be **REMANDED** for reinstatement of plaintiff's long-term disability benefits.

2. Hartford's motion for judgment on the administrative record (Doc. 23) be **DENIED**.

Date: 5/17/2007                                    s/Timothy S. Hogan
                                                   Timothy S. Hogan
                                                   United States Magistrate Judge

# UNITED  STATES  DISTRICT  COURT
## SOUTHERN  DISTRICT  OF  OHIO
### WESTERN  DIVISION

MARVIN SMITH,

     Plaintiff,                                     Civil Action No. 1:05-cv-287

     vs.

HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY, et al.,

     Defendants.                               (Dlott, J.; Hogan, M.J.)


### NOTICE TO PARTIES REGARDING FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **TEN (10) DAYS** after being served with a copy thereof.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **TEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).